**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DAVID DEPYPER and KATE MILASHUS, individually and on behalf of all others similarly situated,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| vs. | ) ) | **Case No. 20 C 2317** |
| **ROUNDY'S SUPERMARKETS INC. and ROUNDY'S ILLINOIS, LLC, d/b/a MARIANO'S,** | ) ) ) ) | |
| **Defendants.** | ) ) | |
| and | ) ) | |
| **SHERIE PLETSCH, individually and on behalf of all others similarly situated,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| vs. | ) ) | **Case No. 22 C 2084** |
| **ROUNDY'S SUPERMARKETS INC. and ROUNDY'S ILLINOIS, LLC, d/b/a MARIANO'S,** | ) ) ) ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

The plaintiffs, former department managers at defendant Mariano's stores (which are banner stores of defendant Roundy's Supermarkets Inc.), have sued the defendants for unpaid overtime pay under the Fair Labor Standards Act (FLSA) and the Illinois Minimum Wage Law (IMWL). They contend the defendants misclassified them as

exempt from overtime pay under both statutes.

The plaintiffs have filed two motions. First, they move to certify a Rule 23 class action. Second, they move to certify two collective actions under the FLSA: (1) a collective of Meat Managers and Bakery Managers and (2) a collective of Deli Managers and Hot Foods Managers. The defendants have moved to decertify both proposed collective actions.

For the reasons stated below, the Court denies the plaintiffs' motion for Rule 23 class certification but grants their motion to certify the two collectives as FLSA collective actions. The Court therefore also denies the defendants' motion to decertify the collective actions.

## Background

### A.    Department managers

Mariano's operates forty-four grocery stores in Illinois across thirty-three cities. It employs "department managers" to work in different departments within its stores: Bakery Managers work in the Bakery Department, Deli Managers work in the Deli Department, and so on.

During the relevant period, the department managers' corporate job descriptions were materially similar. The descriptions indicated that all department managers had several management and supervisory responsibilities, including that they "[i]nstitute 'best practice' leadership and management principles," "manage[] a cost-effective program through appropriate forecasting, planning, ordering and receiving of product[s]," "[d]irect[] and coordinate[] all [department] production and processing," and "supervise team members working in the [department]." *See* Pls.' App'x, Ex. 33. Still,

these job descriptions also included "functional requirements," which specified that department managers must engage in "frequent walking, talking, stair-climbing," "reaching with the hands or arms," and "[o]ccasional kneeling or crouching, lifting up to 50 pounds, and ladder climbing." *Id.* These descriptions also stated that department managers report to the "[s]tore [d]irector." *Id.*

Offer letters for the department manager position communicated that department managers were expected to work a minimum of fifty hours per week. This is important, as both the Fair Labor Standards Act and the parallel Illinois Minimum Wage Law require employers to pay overtime "at a rate not less than one and one-half times the regular rate at which [the employee] is employed" if the employee works for more than forty hours in a workweek. 29 U.S.C. § 207; 820 ILCS 105/4a(1). But both laws contain an exception: an employer does not have to pay overtime to "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1); 820 ILCS 105/4a(2)(E).

In 2016, Mariano's then-Vice President of Human Resources Christa Bertolini determined that all department managers should be deemed "exempt" from state and federal overtime laws. Although the parties debate the thoroughness of Ms. Bertolini's analysis in making this determination, it is undisputed that all department managers were determined to be exempt across all Mariano's locations. Mariano's, therefore, did not pay department managers any overtime even if they worked more than forty hours a week.

## B.    Litigation

On April 14, 2020, former Meat Manager David DePyper and former Bakery

3

Manager Kate Milashus filed a lawsuit against Mariano's and Roundy's Supermarkets—which has Mariano's as a banner store—for violations of the FLSA and the IMWL, seeking unpaid overtime wages. They contended the defendants had misclassified them as exempt, making their failure to pay overtime unlawful under both laws. Mr. DePyper brought his claim on behalf of himself and similarly situated Meat Managers; Ms. Milashus brought her claim on behalf of herself and other similarly situated Bakery Managers. On April 21, 2022, former Deli Manager Sherie Pletsch filed a similar lawsuit against the defendants for the same types of violations on behalf of herself and other similarly situated Deli Managers.

The FLSA allows similarly situated employees to litigate collectively. 29 U.S.C. § 216(b). Employees, however, must opt-in to a proposed collective action to do so. *Id.* To facilitate this opt-in procedure, Mr. DePyper and Ms. Milashus moved to allow for notice to be sent to potential collective members—a process commonly called "conditional certification." Then-presiding Judge Mary Rowland granted conditional certification on November 9, 2020. Ms. Pletsch and the defendants stipulated to conditional certification in their case on June 14, 2022.

At the close of their respective opt-in periods, the collective of Meat Managers and Bakery Managers contained twenty-eight plaintiffs, and the collective of Deli Managers and Hot Foods Managers contained seventy-six plaintiffs. Hilbert Decl. ¶¶ 4–5. By this point, the parties in both cases had agreed to have the two cases consolidated to streamline discovery. They further agreed to depose ten opt-in plaintiffs from each case, with each party selecting three opt-ins and the remaining opt-in plaintiffs chosen at random.

4

Discovery ensued.  The depositions produced relatively uniform testimony.  The opt-in plaintiffs testified that they had little managerial autonomy due to an upper-management hierarchy that required them to report to store directors and left human resource issues to in-store Personnel Service Managers.  *See* Pls.' App'x ¶¶ 18, 40.  The defendants decided to only depose fifteen of the twenty selected opt-in plaintiffs.

But the defendants were not done interviewing department managers.  They produced declarations from then-current department managers that described their work and responsibilities.  These declarants sung a different tune from the opt-in plaintiffs, highlighting several managerial and supervisory responsibilities they had as department managers.

More recently, the case was reassigned to the undersigned judge.  The plaintiffs have moved for certification of two proposed collectives under the FLSA:  (1) the twenty-six-plaintiff Meat Manager and Bakery Manager collective and (2) the seventy-six-plaintiff Deli Manager and Hot Foods Manager collective.  The plaintiffs have also moved to have both their IMWL claims certified as a class action under Rule 23.  The proposed Rule 23 class is defined as:

> all individuals who worked in a Mariano's Deli, Hot Foods, Bakery, and/or Meat department manager-titled position that was internally classified by [the] [d]efendants as exempt from Illinois' overtime laws, for which they were paid a weekly salary at any time between April 14, 2017 (for Meat and Bakery departments) or April 21, 2019 (for Deli and Hot Foods departments) through the date of judgment.

Pls.' Mot. for Cert. at 1.

In response, the defendants moved to decertify the proposed collective actions.

**Discussion**

**A.    Rule 23 class action**

Federal Rule of Civil Procedure 23(a) requires all class actions to meet four requirements:

> (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy of representation).

*Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 434 (7th Cir. 2015) (quoting Fed. R. Civ. P. 23(a)).

"In addition to meeting these requirements of Rule 23, a class action must meet the requirements of one of the four categories in Rule 23(b)." *Id.*  Because the plaintiffs seek damages, they move to have their class certified under Rule 23(b)(3), which further requires:  "(1) the questions of law or fact common to the members of the proposed class predominate over questions affecting only individual members; and (2) that a class action is superior to other available methods of resolving the controversy." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

The plaintiffs "bear the burden of showing that a proposed class satisfies the Rule 23 requirements" by a "preponderance of the evidence." *Id.*  The Court reaches only the commonality and predominance requirements, as they are dispositive in this circumstance.

**1.    Commonality**

Although the plaintiffs need only show "a single common question of law or fact"

to satisfy Rule 23's commonality requirement, "the mere occurrence of all plaintiffs suffering as a result of a violation of the same provision of law is not enough." *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 374 (7th Cir. 2015). Instead, the plaintiffs' claims "must depend upon a common contention that is capable of class-wide resolution." *Id.* This "means that the determination" of the common question's "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

The plaintiffs propose three common questions: (a) whether the defendants "ha[d] failed and/or refused to pay [the] [p]laintiffs and the [c]lass overtime pay for hours worked in excess of 40 hours per workweek within the meaning [of] the IMWL; (b) the nature and extent of class-wide injury and the appropriate measure of damages for the [c]lass; and (c) whether [the] [d]efendants ha[d] a policy of misclassifying [department managers] as exempt from coverage of the provisions of the IMWL." Pls.' Mot. for Cert. at 17.

The first question, although common to the proposed class, is not "central to the validity" of the plaintiffs' misclassification claim. Whether the defendants "failed and/or refused" to pay the plaintiffs' overtime is not disputed in these cases. A misclassification claim rests on the premise that the plaintiffs are already working overtime and are not receiving overtime pay because the employer improperly deemed them exempt. The resolution of the "truth" of the plaintiffs' contention that they did not receive overtime, then, will not move their claims forward—it is an assumed consequence of the employer's exemption determination.

The second question—"the nature and extent of class-wide injury and the

appropriate measure of damages for the [c]lass"—also fails to state a sufficient common question. It is framed at too high a level of generality. As the Supreme Court has emphasized, it is not enough for the plaintiffs to "literally raise[] common 'questions'"; "any competently crafted class complaint" does that inherently. *Wal-Mart Stores*, 564 U.S. at 349 (cleaned up). Generalized questions, such as whether an employer retains "an unlawful employment practice" or "what remedies should [the plaintiffs] get" are not framed with sufficient specificity to satisfy the commonality requirement. *Id.* ("Reciting these questions is not sufficient to obtain class certification.").

The parties spend the most time debating the third proposed common question: "whether [the] defendants have a policy of misclassifying [department managers] as exempt from coverage of the provisions of the IMWL." The defendants contend this fails to state a common question, as the plaintiffs do not claim to have followed Mariano's stated policies for what department managers do but instead claim to have deviated from those policies. The defendants highlight that their written policies for department managers set out numerous "management" responsibilities that several of the plaintiffs testify they did not engage in. *See* Defs.' Opp'n to Pls.' Mot. at 4, 17.

The Court concludes the plaintiffs have shown by a preponderance of the evidence that whether the defendants had a policy of misclassification is a common question. Even accepting the defendants' arguments that there is no uniform written policy that supports such a claim, the Seventh Circuit has recognized that whether an employer had "an unlawful, unwritten policy of denying employees earned overtime compensation" can provide a "common answer that potentially drives the resolution" of litigation. *Bell*, 800 F.3d at 374.

8

The plaintiffs' deposition testimony suggests the existence of such an unwritten policy to misclassify department managers.  Several of the plaintiffs testified that although their job descriptions indicated managerial duties, an in-store hierarchy in which store directors and Personnel Service Managers handled managerial tasks prevented department managers from having significant managerial responsibilities.  *See* Pls.' App'x ¶¶ 18, 40.  This, according to these deposed plaintiffs, left them with mostly "front lines" manual labor tasks, which involved "work[ing] side by side with hourly workers doing their same tasks."  *Id.* ¶¶ 32, 35.

The defendants disagree that this testimony is enough.  They contend that any existence of such an unwritten policy is undermined by differing testimony from other class members.  Although the defendants acknowledge that some department managers testified during their depositions that they "did not regularly perform any managerial or administrative tasks," the defendants emphasize that declarations from then-current department managers described a wide array of managerial responsibilities.  *See* Defs.' Opp'n to PLs.' Mot. at 25.

The plaintiffs, however, must only "prove the *existence* of a common question" by a preponderance of the evidence at the certification stage.  *Bell*, 800 F.3d at 376 (emphasis in original).  They "need not prove that the answer to that question will be resolved in [their] favor."  *Id.*  Conflicting statements regarding the managerial duties of department managers concern whether the plaintiffs will succeed on the merits of their argument that an unofficial policy prevented them from engaging in exempt managerial work.  This does not detract from the plaintiffs' deposition testimony, which "point[s] to a common question" regarding "whether [the defendants] had an unwritten practice or

policy that required" department managers to engage in a significant amount of non-exempt work.  *See id.* at 377–78 (concluding that the plaintiffs established commonality based in part on testimony from "employees from at least six other branches" who alleged that the employer "had an unofficial policy against compensating overtime work").

### 2. Predominance

For a class to be certified under Rule 23(b)(3), common questions must "predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  "The predominance 'inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Schroeder v. Progressive Paloverde Ins. Co.*, --- F.4th ---, 2025 WL 2083855, at *4 (7th Cir. 2025) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).  "It 'calls upon courts to give careful scrutiny to the relation between common and individual questions in a case' and to consider their relative importance."  *Id.* (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)) (internal citation omitted) (cleaned up).

For common questions to predominate, "the common, aggregation-enabling issues" in a case must be "more prevalent or important than the non-common, aggregation defeating, individual issues."  *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 607 (7th Cir. 2021) (quoting *Tyson Foods*, 557 U.S. at 453) (cleaned up). The critical question for predominance, then, is whether "common questions represent a *significant* aspect of a case" as compared to individual inquiries.  *Shroeder*, 2025 WL 2083855, at *4 (emphasis in original) (cleaned up).

Although the plaintiffs have established a common question regarding whether

10

the defendants employed an unofficial misclassification policy, they have not shown by a preponderance of the evidence that this common question will predominate over the significant individual issues in these cases.  A brief delve into the merits is required to understand the full extent of the individual issues that the Court concludes predominate in this dispute.  *Cf. Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 845 (7th Cir. 2022) ("The Rule 23(b)(3) predominance requirement inherently requires the court to engage with the merits of the case . . . .") (cleaned up); *Schroeder*, 2025 WL 2083855, at *4 ("A court must circumscribe the claims and break them down into their constituent elements to decide whether common questions represent a significant aspect of the case.") (cleaned up).  A violation of the FLSA is necessary to make an IMWL claim, so the Court solely considers the requirements of the FLSA.  *See Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 375–76 (7th Cir. 2005) (citing 820 ILCS 105/4(a)(2)(E)) (noting that "a violation of the IMWL" is "contingent on establishing a violation under the FLSA").

To avoid liability, the defendants must prove that the plaintiffs were correctly labeled as "exempt" from the FLSA's overtime requirements.  This requires proving that the plaintiffs were "employed in a bona fide executive, administrative, or professional capacity."  *Id.* at 369 (quoting 29 U.S.C. § 213(a)(1)).  Although it is the "employer's burden to establish that an employee is exempt from the FLSA's overtime requirements," *id.*, the "predominance of individual issues necessary to decide an affirmative defense" can "preclude class certification."  *Gorss Motels*, 29 F.4th at 845 (citation omitted).

The defendants argue that the plaintiffs are exempt from the FLSA's overtime

requirements—and thus cannot succeed on their claims—based on the FLSA's "administrative exemption," the "executive exemption," or a combination of the two. "The FLSA does not define" what it means to be employed in an "executive" or "administrative" capacity; "instead, it expressly delegates that task to the Secretary of Labor who may 'from time to time' alter the definitions." *Kennedy*, 410 F.3d at 369 (quoting 29 U.S.C. § 213(a)(1)).

The regulations that define these exemptions are extensive. For the administrative exemption, employees are exempt from the FLSA's overtime requirements if: (1) they are "[c]ompensated on a salary or fee basis at not less than the level set forth in § 541.600"; (2) their "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) their "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200.

For the executive exemption, employees are exempt from the FLSA's overtime requirements if: (1) they are "[c]ompensated on a salary basis at not less than the level set forth in § 541.600"; (2) their "primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof"; (3) they "customarily and regularly direct[] the work of two or more other employees"; and (4) they have "the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." *Id.* § 541.100.

Finally, the regulations set out a "combination exemption," which allows "[e]mployees who perform a combination of exempt duties" to be exempt even if they lack a qualifying "primary duty" described in other exemptions. *Id.* § 541.708. "[T]he combination exemption provides a mechanism for cobbling together different exempt duties for purposes of meeting the primary-duty test." *IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 294 (4th Cir. 2007).

It is undisputed that the department managers were given the requisite salary for these exemptions to apply. So the central debate is whether the department managers' "primary duty" was "administrative" (the performance of office or non-manual work), "executive" (the management of general business operations), or a combination of the two.

Again, the Court must look to the regulations. "Primary duty" is defined as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). And the regulations suggest that the "primary duty" inquiry is highly fact-dependent—"[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* The fact finder must consider numerous "facts" concerning an employee's specific work obligations:

> Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.*

In light of this individualized, fact-intensive analysis, the importance of the plaintiffs' established common question—whether defendants had a policy of misclassifying department managers—is minimal. There is no question that a finding that the defendants employed an unofficial misclassification policy will move the plaintiffs' claims forward, in that it would indicate the department managers engaged in mostly non-exempt work. But that would not end the inquiry. The factfinder will still have to consider "all the facts in a particular case" before concluding that this unofficial policy actually resulted in a given department manager not having an exempt "primary duty."

This is especially so considering that the FLSA imposes no strict percentage requirement on how much exempt work an employee must engage in to be classified as exempt. Although the regulations suggest that "time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee," they expressly emphasize that "[t]ime alone . . . is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work." *Id.* § 541.700(b); *see also Kennedy*, 410 F.3d at 374 ("[J]ust because an employee may spend a significant portion of his time engaged in ministerial or routine tasks does not necessarily prevent the application of the administrative exemption.") (citation omitted). The factfinder must still consider "other factors" when determining the applicability of these FLSA exemptions even if the defendants employed a policy that resulted in department managers engaging in a majority of non-managerial work. 29 C.F.R. § 541.700(b).

The likely individualized inquiries do not end with the primary duty analysis.

Each of the exemptions has unique requirements that likely involve further individualized inquiries. The administrative exemption's requirement that the employee engage in "the exercise of discretion and independent judgment," for example, "must be applied in the light of *all the facts involved in the particular employment situation* in which the question arises." *Id.* § 541.202(b) (emphasis added). The suggested factors a factfinder considers when deciding whether an employee engages in discretion and independent judgment are numerous:

> Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management of the business, whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id.*

Nor is the fact that department managers may have their decisions reviewed by higher-ups dispositive. "[E]mployees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." *Id.* § 541.202(c); *see also Kennedy*, 410 F.3d at 376 (noting discretion and independent judgment is still possible even if an employment setting is "procedure driven, routine, and strictly controlled"). It is no wonder that the Seventh Circuit has described the application of the FLSA's exemptions as "requir[ing] a thorough, fact-intensive analysis of the employee's employment duties and responsibilities." *Schaefer-LaRose v. Eli Lilly*

15

*& Co.*, 679 F.3d 560, 572 (7th Cir. 2012).

The plaintiffs contend that these individual inquiries are illusory.  They argue that because the evidence suggests only "slight variations" in department manager duties, the plaintiffs can prove their claims with "common evidence" of "comprehensive corporate policies and procedures."  Pls.' Reply at 4–5 (first quoting *Ross v. RBS Citizens, N.A.*, 667 F.3d 900, 909–910 (7th Cir. 2012), *cert. granted, judgment vacated, remanded by*, 569 U.S. 901 (2013) (mem.)).

The defendants, however, provide declarations from department managers that indicate a wide range of managerial and supervisory responsibility across the proposed class.  For example, declarant Doris Brooks stated that she "observe[d] associate behaviors" in her department "[t]hroughout the day," "provide[d] coaching," and "identfi[ed] issues in [her] department and ma[d]e adjustments as needed."  Mot. to Decert., Ex. H, ¶ 12.  This declaration is in stark contrast with the deposition testimony of Ms. Pletsch, who testified she was "unable to give directions to the employees in [her] department."  Pls.' App'x, Ex. 12, at 65:19–21.

There are also differences in the statements of department managers regarding their claimed powers to recommend hiring or termination.  Although Ms. Milashus testified in her deposition that she had no involvement in the hiring or firing process, Pls.' App'x, Ex. 8, at 80:14–16, 83:17–19, declarant Adam Parrot stated that "it is up to [him] to decide where [his] department needs to be filled and what positions to hire for" and that his hiring recommendations are "followed."  Mot. to Decert., Ex. T, ¶ 9. Declarant Samer Sweilem noted even further involvement in the hiring and firing process, stating that he is "involved in the interview process" and that he is "in charge of

recommending people for suspension" and "termination." *Id.*, Ex. W, ¶¶ 7, 17.

Finally, members of the proposed class allege differing amounts of supervisory responsibilities. Plaintiff Carlos Coronado testified during his deposition that he supervised no employees. Pls.' App'x, Ex. 4, at 23:5–7. But declarant Matthew McNames stated that he "manage[d]" and "supervise[d]" "a crew of 10 employees." Mot. to Decert., Ex. P, ¶ 3. And Mr. Sweilem stated that he "manage[d]" and "supervise[d]" "approximately" twenty to thirty-two employees. *Id.* Ex. T, ¶ 3.

The plaintiffs suggest that the declarations proffered by the defendants should be ignored because they were procured by the defendants from current employees. The Court recognizes these so-called "happy camper" declarations must be taken with a grain of salt, as current employees have an incentive to speak favorably about their employer. *See Brown v. Nucor Corp.*, 785 F.3d 895, 913–914 (4th Cir. 2015) (noting that "courts should proceed with eyes open to the imbalance of power and competing interests" when assessing the probative value of current employee declarations procured by an employer). But the Court cannot ignore these declarations entirely. They represent the testimony—under oath—of other class members; their relevance in determining whether the "proposed class[] [is] sufficiently cohesive to warrant adjudication by representation" is undeniable. *Cf. Schroeder*, 2025 WL 2083855, at *4.

Nor is the Court persuaded that the lack of adversarial scrutiny placed on these declarations justifies discarding them. Although the plaintiffs emphasize that the declarations were taken "without cross-examination or notice to or presence of [the] [p]laintiffs' counsel," *see* Pls.' Reply at 7–8, these declarations were produced to the plaintiffs during discovery. If the plaintiffs believed the declarations did not state the full

story of the declarants' work environment, they could have taken the declarants' depositions (or, to the extent this would have exceeded limitations on depositions, could have asked for leave to do so). The plaintiffs cannot legitimately complain about the lack of adversarial scrutiny over the declarants' statements when they are the parties who failed to subject these statements to that scrutiny. It is the plaintiffs' burden to establish predominance under Rule 23, and it was therefore their responsibility to take steps to counter contrary evidence that suggests a lack of predominance.

Finally, the Court is not persuaded, at this point at least, that the deposition testimony the plaintiffs rely on is undoubtedly more credible than the declarations. The only plaintiffs deposed in these proceedings were those who opted into the FLSA collective action, meaning they too had an incentive to emphasize or downplay certain aspects of their work environment to support their claims. The plaintiffs give little reason to put dispositive value in their "unhappy camper" depositions in the face of conflicting "happy camper" declarations.

Considering the wide array of different responsibilities alleged by the class members, the Court concludes the plaintiffs have not shown by a preponderance of the evidence that common questions will predominate in this dispute. Even if the factfinder concludes that the defendants had an unofficial policy or practice that limited the managerial work a department manager could engage in, individualized questions would remain regarding whether each plaintiff actually had an exempt "primary duty" anyway based on the employee's day-to-day work. The current record reflects that the "primary duty" inquiry—and any other individualized elements present within the FLSA's exemptions—cannot be answered in this dispute without an analysis into a specific

department manager's work routine.  Nothing in the record suggests that this can be done on an across-the-board basis for all members of the proposed class(es), or even for significant groups of those members.

### 3.     Issue class certification

In the alternative, the plaintiffs argue for issue-class certification.  Rule 23(c)(4) allows a class action to be "brought or maintained . . . with respect to particular issues." Fed. R. Civ. P. 23(c)(4).  For Rule 23(b)(3) classes certified as an issue class, the Seventh Circuit has emphasized that plaintiffs need not "show common issues predominate in the resolution of the entire claim" as they would for a usual, non-issue class action.  *Jacks v. DirectSat USA, LLC*, 118 F.4th 888, 896–98 (7th Cir. 2024).  But the predominance requirement does not disappear for Rule 23(b)(3) issue classes.  "[A] party seeking certification of an issue under Rule 23(c)(4) must show that common questions predominate in the resolution of the specific issue or issues that are the subject of the certification motion . . . "  *Id.* at 897.  In other words, although plaintiffs may use issue classes to litigate common questions that do not predominate over the entire case, issue classes cannot be used to resolve "minor or insignificant common questions."  *Id.* at 898 (quoting *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 413 (6th Cir. 2018)).  Rather, they must "materially advance" the plaintiffs' claims. *Id.* at 899.

The plaintiffs suggest that the Court could "'bifurcate the case into a liability phase and a damages phase,' whereby the Court 'determines liability on a classwide basis and then resolves individual damages by other means.'"  Pls.' Mot. at 26 (quoting *McMahon v. LVNV Funding, LLC*, 807 F.3d 872, 876 (7th Cir. 2015)).  But as discussed

above, the plaintiffs have not shown that liability can be established on a class-wide basis. The record reflects claimed differences in the class members' work routines that do not appear to be susceptible to class-wide resolution.

Nor is the Court persuaded that an issue-class certification on whether there was an unofficial misclassification policy—the sole established common question—will materially advance the litigation. Whether or not the plaintiffs establish this unofficial policy exists, the factfinder still would need to consider several other factors to determine whether a specific department manager is covered by the cited FLSA exemptions. This is thus "not a case where liability . . . can be determined" by "uncomplicated follow-on proceedings." *Jacks*, 118 F.4th at 899. Instead, "determining liability" likely would "necessitate [many] of separate trials to evaluate the nature and scope of an individual [department manager's] work." *Id.* Certifying a class on this one issue will "not materially advance [the] plaintiffs' claims given the magnitude of what remains." *Id.*

The Court therefore denies the plaintiffs' motion for Rule 23 class certification.

## B.    FLSA collective actions

Section 216 of the FLSA grants employees the right to sue an employer to recover wages not just on behalf of "themselves," but also collectively on behalf of "other employees similarly situated." 29 U.S.C. § 216(b). "The statutory text authorizing" these "collective actions" is "sparse." *Richards v. Eli Lilly & Co.*, --- F.4th ---, 2025 WL 2218500, at *1 (7th Cir. 2025). The statute "explains neither what it means to be similarly situated nor by what standard . . . courts must assess the similarity of the collective." *Id.*

Some past Seventh Circuit cases suggested that FLSA collective actions should be judged by the same standards as Rule 23 class actions. The most direct statement of this sentiment is in *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013), in which the court, in an opinion by Judge Posner, said the standards had essentially "merged." *Id.* at 772 ("[T]here isn't a good reason to have different standards for the certification of the two different types of action, and the case law has largely merged the standards, though with some terminological differences.").

But more recent Seventh Circuit and Supreme Court precedent have highlighted the differences between class and collective actions. "Though, at first blush, [collective actions] resemble a Federal Rule of Civil Procedure 23 class action, the two actions are 'fundamentally different' in practice." *Richards*, 2025 WL 2218500, at *1 (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74 (2013)). Class actions are a "representative" action: "a named plaintiff represents the right of absent non-party plaintiffs who will be bound by the disposition of the case unless they opt out of the class." *Id.* "[C]ollective actions are, by contrast, a consolidation of individual cases, brought by individual plaintiffs," who "must affirmatively opt in to join [the] collective action." *Id.* (cleaned up).

Recognizing these differences, the Seventh Circuit has emphasized that FLSA collective actions do not have the same requirements as a Rule 23 class action. Unlike Rule 23, "[n]othing" in the FLSA requires "adequate representation." *Vanegas v. Signet Builders, Inc.*, 113 F.4th 718, 724 (7th Cir. 2024). Nor does the FLSA include anything "comparable to Rule 23(b)(3)'s requirements of predominance or superiority." *Id.* at 724–25 (quoting *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 519 (2d Cir. 2020)).

"In short: FLSA collective actions are unlike class actions." *Id.*; *see also Symczyk*, 569 U.S. at 74 (concluding that Rule 23 class action cases were "inapposite" when considering mootness standards in collective actions "because Rule 23 actions are fundamentally different from collective actions under the FLSA").

This leaves a more difficult question: what standards should apply to FLSA collective actions? Due to "minimal guidance from Congress or the Court," district courts have historically "been left to devise their own standards" in "the management of a collective action." *Richards*, 2025 WL 2218500, at *2. "[M]ost district courts . . . follow[]" a "two-step[]" approach commonly known as "conditional certification" and "decertification." *Id.* "At the first step, a plaintiff seeking notice to a proposed collective" must make "a threshold showing that there is a material factual dispute as to whether the proposed collective is similarly situated." *Id.* at *2, *7. "Step two," which is where the collectives in these cases are now, "occurs once opt-in and discovery are complete." *Id.* at *2. "[W]ith the benefit of more specific information about the collective's membership, the court engages in a more rigorous review to determine whether the plaintiffs are, in fact, similarly situated." *Id.*

In *Richards v. Eli Lilly & Co*, the Seventh Circuit clarified certain aspects of this process relevant to this dispute. The court emphasized that the labels "conditional certification" and "decertification" are "misleading[]." *Id.* "[T]he sole consequence of conditional certification is the sending of court-approved written notice to employees"; it "does not produce a legal class or join any parties to the action." *Id.* (quoting *Symczyk*, 569 U.S. at 75). "Thus, at step two, there is technically no collective to 'decertify.'" *Id.*

Because so-called "conditional certification" does not actually certify a collective

action, a defendant need not later move for "decertification" as the defendants did in this dispute. Instead, "once opt-in is complete," it is the plaintiffs that "bear the burden of moving to certify their collective action." *Id.* at *6. And to meet that burden, "the plaintiffs must establish their similarity at the certification stage by a preponderance of the evidence." *Id.*

The Seventh Circuit in *Richards*, however, did not comment on what standard district courts should apply to determine whether the plaintiffs' proposed collective contains similarly situated employees. District courts thus remain "left to devise" their own standard. *Cf. id.* at *2.

The courts in this circuit and elsewhere have adopted a three-factor test to determine whether employees are similarly situated, in which the Court considers: "(1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns." *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 345 (N.D. Ill. 2012) (St. Eve., J.). Courts recognize that these factors set out a "much lower bar" than Rule 23 class certification. *Dennis v. Greatland Home Health Servs., Inc.*, 591 F. Supp. 3d 320, 330 (N.D. Ill. 2022) (quoting *Lukas v. Advoc. Health Care Network & Subsidiaries*, No. 14 C 2740, 2015 WL 5006019, at *8 (N.D. Ill. Aug. 19, 2015)); *see also Scott*, 954 F.3d at 520 ("[T]he FLSA not only imposes a lower bar than Rule 23, it imposes a bar lower in some sense than Rules 20 and 42 . . . ."). The requirements of Rule 23(a) and (b)(3) are notably absent. *See Vanegas*, 113 F.4th at 724–25; *Scott*, 954 F.3d at 518–19 (noting it is "well established that the FLSA's 'similarly situated' requirement is

independent of, and unrelated to Rule 23's requirements") (cleaned up).

This lower bar is intentional, and it derives from Congressional intent in authorizing collective actions. "Rule 23 and § 216(b) serve fundamentally different purposes." *Scott*, 954 F.3d at 519. While Rule 23 "provides a general procedural mechanism for the resolution of claims on a class-wide basis," section 216 of the FLSA "is tailored specifically to vindicating federal labor rights." *Id.* "[E]mployees have a substantive 'right' to proceed as a collective, a right that does not exist under Rule 23." *Id.* at 519–20 (quoting 29 U.S.C. § 216(b)). Respect for this right to collective action is important—the purpose of the FLSA collective action mechanism is to give employees "the advantage of lower individual costs to vindicate rights by the pooling of resources." *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). A more stringent standard akin to the one set out in Rule 23 risks defeating "[t]he broad remedial goal" of the FLSA. *See id.* at 173.

That said, this right to collective action is not unlimited. Employees must be similar enough to allow for a manageable adjudication of a proposed collective's claims. The standard's focus on similarity, manageability, and fairness ensures that the claims of the members of the proposed collective are materially similar enough to make a just and efficient collective adjudication possible. *Cf. Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1049 (7th Cir. 2020) (noting that the collective action's "twin goals" of "enforcement and efficiency" must be balanced against the "dangers" of "abuse of the collective-action device").

With the test and its underlying principles laid out, the Court reviews the three factors to determine if the plaintiffs within the proposed collectives are "similarly

situated" under the FLSA.

### 1. Similar factual and employment setting

For the first factor, the "operative question" is "whether there is 'an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws.'" *Haugen v. Roundy's Illinois, LLC*, 552 F. Supp. 3d 806, 808 (N.D. Ill. 2021) (quoting *Camilotes*, 286 F.R.D. at 346). "Courts typically consider such factors as location, job duties, supervision, and policies or practices that bind the plaintiffs' claims together." *Id.* (citation omitted); *see also Camilotes*, 286 F.R.D. at 346 (collecting cases). But the FLSA only requires plaintiffs to be "similarly situated"—they "need not be identically situated" to litigate as a collective. *Camilotes*, 286 F.R.D. at 246; *see also Russell v. Ill. Bell. Tel. Co.*, 721 F. Supp. 2d 804, 812 (N.D. Ill. 2010) (Kennelly, J.) (collecting cases).

The plaintiffs note a number of similarities in their work settings. The evidence suggests the two collectives' department managers: (1) were "uniformly classified as exempt" irrespective of their actual work responsibilities or shop location, Pls.' App'x ¶ 4; (2) had materially similar job descriptions that all included "functional requirements" specifying their positions "require[d] frequent walking, talking, stair-climbing," "reaching with the hands or arms," and "[o]ccasional kneeling or crouching, lifting up to 50 pounds, and ladder climbing," *id.*, Ex. 33; (3) did manual labor on the "front lines," "work[ing] side by side with hourly workers doing their same tasks," *id.* ¶¶ 32, 35; (4) were constrained by a hierarchy that required them to report to store directors and gave the in-store Personnel Service Managers the responsibility of handling human resources work, *id.* ¶¶ 18, 40; (5) were further constrained by "planograms"—automated

25

programs that suggested how much of a product the department managers should produce and where products should be located, *id.* ¶¶ 20–22; (6) received salaries based on an expectation that they would "work a minimum of 50 hours per week" and received no overtime pay, *id.* ¶¶ 28, 31; (7) received "the same corporate training" and "did not need to be retrained when transferring stores," *id.* ¶ 24; and (8) were reviewed using "uniform performance evaluation[s]," *id.* ¶ 25.

Despite these similarities, the defendants attempt to draw several divides among the proposed collective members. First, they emphasize that Mariano's has many locations—forty-four in total. "Because of the number of Mariano's locations" and "the fact that at least half of the [c]ollective [m]embers held multiple management positions during the relevant period and/or worked at multiple Mariano's locations," the defendants contend the members of the proposed collectives are too dissimilar to allow for collective actions. Defs.' Mem. in Supp. of Mot. to Decert. at 9.

Yet the defendants offer little evidence to support their contention that Mariano's stores materially differed in ways that are relevant to the plaintiffs' claims. Their briefs offer no explanation for how stores differ. And the defendants' response to the plaintiffs' appendix of evidence simply states that "Mariano's locations have different staff working in their stores who implement policies and decide to follow policies in different ways." Defs.' Resp. to Pls.' App'x ¶ 15. There is no explanation provided for how any supposed differences in staff materially impacted the department managers' work or responsibilities.

The sole citation to evidence in support of this argument is the deposition testimony by Vice President of Human Resources Lee Kunselman, which Mariano's

26

argues indicates "that there are still nuances at the store level even though Mariano's has policies and procedures." *Id.* Mr. Kunselman did testify that "there's still some nuance at the store level." Pls.' App'x, Ex. 18, at 148:18. But when pressed later as to how different stores created differences in department managers' work, Mr. Kunselman only stated that "multi-level stores" "could" cause differences based on whether a department manager had "to take an elevator to a different floor of a store or to find a back room or . . . a production area in the store." Pls.' App'x, Ex. 16, at 444:10–17. Even accepting this hypothetical as true, it is hard to see how simple differences in *where* department managers were supposed to find and produce products would create material distinctions among collective members.

Nor does it appear that the defendants considered any store differences when deciding to label department managers as exempt. Mr. Kunselman admitted that any possible store difference was not taken into account when determining whether department managers were exempt from overtime pay. *Id.* at 445:3–6 ("Q. But department managers were uniformly classified as exempt regardless of store location and any differences in the store layout, correct? A. Yes."). Considering that the defendants themselves thought store location was immaterial when classifying department managers as exempt, the Court cannot accept their conclusory, vague, and largely unsupported arguments that different Mariano's locations created differing factual and employment settings. *See Morgan v. Fam. Dollar Stores, Inc.*, 551 F.3d 1233, 1263 (11th Cir. 2008) (affirming the certification of a collective action despite an employer's "assertion that the duties of store managers varied significantly depending on the store's size, sales volume, region, and district" when "there was scant evidence

27

to support" this assertion).

Next, the defendants contend that collective members' own depositions indicate "extreme factual differences between [c]ollective [m]embers." Defs. Mot. to Decert. at 9. They initially highlight contradictions between the collective members' depositions and their job descriptions. The defendants note that the plaintiffs' deposition testimony conflicts with department manager job descriptions that require them "to plan, direct, and manage the operations of the department and to provide leadership, support, and guidance to drive sales and profits." *Id.* (cleaned up).

But as the defendants seem to acknowledge, the plaintiffs all "testified that they did not perform these duties." *Id.* Arguing that there is a difference between the collective members' deposition testimony and department manager job descriptions does not show a difference among the *plaintiffs*; it just indicates a difference between the plaintiffs' testified work activities and the activities detailed in their job descriptions as written by Mariano's. This alleged mismatch between what the plaintiffs actually did and what their job descriptions described is the entire basis of their misclassification claim. The fact that the plaintiffs uniformly testified that their job descriptions did not accurately reflect their actual work is a similarity among them, not a difference.

Perhaps recognizing the uniformity of the collective members' depositions, the defendants look elsewhere for evidence that there were factual differences between the collective members. In particular, they cite declarations from current department managers who emphasize a wide array of management and supervisory experience.

The defendants label these declarations as coming from "other [c]ollective [m]embers." *Id.* at 10. That is incorrect. Nearly all of the declarations are from

managers who are not plaintiffs in the proposed collectives, as hardly any of the declarants opted-in to either of the two collectives at issue. These conflicting declarations, then, do not evidence differences among the plaintiffs. At best for defendants, the conflicts suggest that the opt-in plaintiffs might be exaggerating how little managerial work they performed. But that simply bears on the credibility of the plaintiffs' testimony and the merits of their claims—it is not evidence of a difference among the plaintiffs themselves.

There is only one declaration that came from a current opt-in plaintiff—Samuel Flanagan. Curiously, it does not appear that Mr. Flanagan had his deposition taken by either side, meaning that his declaration is the only evidence describing his work responsibilities. Even taking Mr. Flanagan's declaration as true, however, does not override the several other depositions from the collective members who all state that they did little to no managerial work. Again, plaintiffs need not be identical to litigate as a collective, but only "similarly situated." *Camilotes*, 286 F.R.D. at 346; *see also Morgan*, 551 F.3d at 1246 (affirming a judgment for a collective when the district court "found that most (90%) of the named and opt-in plaintiffs" did little managerial work). As discussed above, the depositions highlight several similarities among the collective members, including a uniform classification as exempt, hierarchical constraints that hindered managerial action and discretion, and an expectation to work 50 hours per week. A lone declaration from one plaintiff indicating more managerial responsibility than other testimony suggests goes to the credibility of the collective members' testimony and the merits of their claims; it does not prevent a collective action from proceeding altogether.

### 2.    Affirmative defenses

For the second factor, a court considers "whether the defendants' defenses could be applied across the board to [the] [p]laintiffs' claims" or "whether many and perhaps disparate defenses could be raised." *Camilotes*, 286 F.R.D. at 352.  The defendants emphasize that the three relevant exemptions they attempt to claim—the administrative, executive, and combination exemptions—all require highly fact-intensive, individualized inquiries.

Yet "[j]ust because the inquiry is fact-intensive does not preclude a collective action where the plaintiffs share common job traits." *Morgan*, 551 F.3d at 1263.  The question is not, as Mariano's seems to believe, whether the plaintiffs' claims can be resolved with common or "[r]epresentative [p]roof." *See* Defs.' Mot. to Decert. at 18. This is not a class action—in a collective action, no plaintiff "represents" another. Instead, collective actions are an "agglomeration[] of individual claims" in which "each plaintiff has the right to . . . advance his or her own claim." *Vanegas*, 113 F.4th at 725 (citation omitted).  Thus, "[f]rom filing to judgment, 'collective actions permit individualized claims *and individualized defenses*.'" *Id.* (quoting *Canaday v. Anthem Cos.*, 9 F.4th 392, 403 (6th Cir. 2021)) (emphasis added).

When considering whether defenses are unduly disparate, the inquiry is not how fact-specific they are, but whether considering the defenses raised would make a collective action "unwarranted or unmanageable." *Morgan*, 551 F.3d at 1263.  The Court is not persuaded that the exemptions raised are so disparate to justify a denial of collective certification.  The collective actions certainly seem warranted despite the individualized nature of the FLSA exemptions, as the defendants themselves

determined that all department managers were exempt with seemingly no individualized inquiry into each department manager's responsibilities. *See id.* (concluding that the employer's application of "the executive exemption across-the-board to every store manager" indicated the raised "defenses were not so individually tailored to each [p]laintiff as to make th[e] collective action unwarranted or unmanageable").

Nor is there a reasonable basis to believe that the Court would be unable to manage a collective litigation of these exemptions. The fact that the defendants contend that each of these exemptions applies to all the department managers indicates that they plan to argue the exemptions are applicable to every plaintiff, meaning it will not be difficult to keep track of which plaintiffs are accused of falling under which exemption. In other words, there is no indication that the defendants plan to raise any unique or disparate defenses—they contend that the same exemptions apply to all the plaintiffs.

The defendants raise the specter of having a factfinder decide the applicability of these exemptions "for almost 100 employees," contending it would be "impractical." Defs.' Mot. for Decert. at 21. But neither collective in this dispute includes 100 plaintiffs. The collective of Meat Managers and Bakery Managers includes twenty-eight members, while the collective of Deli Managers and Hot Foods Managers has seventy-six. Hilbert Decl. ¶¶ 4–5. The number of plaintiffs in these collectives is well within the realm of manageability. *See, e.g.*, *Morgan*, 551 F.3d at 1239, 1285 (affirming a judgment in favor of a collective that contained "1,424 store managers"). And it is clear that, if need be, the collectives could be further divided. There could be a collective of just Meat Managers, just Deli Managers, just Hot Foods Managers, etc. But even setting aside

these possibilities for now, the Court is not persuaded at this juncture that the current collectives are so large that they are unmanageable. *Cf. Smith v. Fam. Video Movie Club, Inc.*, No. 11 C 1773, 2015 WL 1542649, at *9 (N.D. Ill. Mar. 31, 2015) (Lee, J.) (certifying a collective when "remaining variance[s] [could] be further accommodated through case management procedures").

### 3. Fairness and procedural concerns

"The third and final factor requires the court to consider whether proceeding as a collective would create fairness or procedural benefits." *Hundt v. DirectSat USA, LLC*, 294 F.R.D. 101, 108 (N.D. Ill. 2013) (quoting *Strait v. Belcan Eng'g Grp.*, No. 11 C 1306, 2012 WL 5988877, at *16 (N.D. Ill. Nov. 29, 2012)); *see also Hoffman-La Roche*, 493 U.S. at 170 (noting FLSA collective actions "benefit[]" the "judicial system" by allowing "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity"). "Fairness dictates that manageable individual variance should not prevent [p]laintiffs from proceeding collectively under a remedial statute like the FLSA." *Smith*, 2015 WL 1542649, at *9. Still, the Court must "balance" the plaintiffs' desire to litigate collectively with the potential unfairness to the defendants "and manageability problems for the Court." *Camilotes*, 286 F.R.D. at 353.

The defendants initially rehash their arguments that the lack of "representative evidence" available to resolve their cited exemptions makes these collective actions unfair and unmanageable. *See* Defs.' Mot. to Decert. at 22–23. But as other courts have noted, "[t]here is nothing inherently unfair about collectively litigating an affirmative defense"—such as "the executive-exemption defense"—when there is "well-supported and detailed" evidence that the collective members are similarly situated. *Morgan*,

32

551 F.3d at 1264.  The defendants cannot claim that a collective action is "unfair" simply because the FLSA contains individualized exemptions—that would allow the FLSA's exemptions to effectively override the employees' statutory right to litigate collectively.

The defendants further argue that credibility issues unique to certain collective members will make any collective action unfair or inefficient.  They contend that several collective members gave deposition testimony that is "contradictory, evasive, and, at times, nonsensical."  Defs.' Mot. to Decert. at 23.  The defendants' cited evidence to support this contention, however, is unconvincing.

First, the defendants highlight portions of collective member Pammela Aguilar's testimony.  They note that when Ms. Aguilar was first asked if she "agree[d] that as the hot food[s] manager [she] supervised the employees within the hot foods department," she stated that she "did not agree that I supervised them, but the responsibility did fall on me for sure."  Defs.' Mot. to Decert. at 23 (quoting Pls.' App'x, Ex. 1, at 57:18–23).  When then asked to "explain that answer," Ms. Aguilar replied that "there wasn't no direct supervision, you know.  Store director had the last word.  Obviously we couldn't make up our own sandwich or we couldn't cook things out of the norm if it wasn't, you know, based on the plan, so - -."  Id. (quoting Pls.' App'x, Ex. 1, at 58:1–5).  It appears the questioner then interjected with this question, "So would you agree that you supervised employees within the company policies?", to which she answered: "Correct."  Id. (quoting Pls.'s App'x, Ex. 1, at 58:6–8).  This interaction, according to the defendants, illustrates that Ms. Aguilar "could not keep her story straight."  Id.

The Court struggles to see the contradiction here.  Ms. Aguilar stated that she did not agree that she "supervised the employees within the hot foods department" and

then explained what she meant, noting that it was the "[s]tore director" who "had the last word." The interjected follow-up question asking whether she agreed that she "supervised employees within the company's policies" appears, in context, to refer to the hierarchy Ms. Aguilar had just described, making it natural for her to respond, "[c]orrect." This passage, fairly read, does not evidence a shifting narrative, but an explanation regarding what Ms. Aguilar's alleged supervisory responsibilities entailed.

The defendants also quibble with how Ms. Aguilar described her alleged powers to recommend termination. In response to being asked whether she made "any recommendations regarding termination," Ms. Aguilar responded, "I did, but they would terminate themselves." Defs.' Mot. to Decert. at 23 (quoting Pls.' App'x, Ex. 1, at 204:1–5). Although this might be an odd statement in isolation, Ms. Aguilar immediately explained herself in the next line: "So three no call, no shows, the employee is fired." Pls.' App'x, Ex. 1, at 204: 5–6. Then when asked if "there ever [was] an instance where [she] recommended an employee in [her] department be terminated for some reason and the individual ultimately was not terminated," Ms. Aguilar further explained: "No, like I said before, we don't fire people. They fire themselves by not showing up to work, you know." Pls.' App'x, Ex. 1, at 204: 16–24. What is clear from these statements is that Ms. Aguilar is describing a three-absences-and-you're-fired company policy that she says led to terminations, rather than any recommendations she made—hence the phrase "terminated themselves." None of these out-of-context deposition passages referenced by the defendants indicate that Ms. Aguilar—or any of the other collective members—have unique credibility issues that would hamper collective adjudication.

Next, the defendants contend that certain collective members lack credibility

34

because their resumes described "management, training, and oversight-related duties," contradicting their deposition testimony in which they claimed to not engage in such activities. Defs.' Mot. to Decert. at 24–26. These conflicts do not sustain the weight that the defendants place on them. It is worth pointing out that an inherent consequence of being allegedly misclassified as a manager—one could even call it an unintended benefit—is that the misclassified employees could accurately describe themselves as "managers" or "supervisors" on their resumes, whether or not they actually did any managing or supervising.

But even if one takes these resumes at face value, they do not drive a wedge between any of the collective members that would make a collective action inappropriate. Although the resumes highlight the management and training aspects of the collective members' jobs, they say nothing about how often these employees actually engaged in those managerial duties, the more significant merits issue here. "It is unsurprising that an employee would choose to emphasize in a resume managerial tasks, such as hiring or training new employees, over non-managerial tasks . . . even where the managerial tasks took up significantly less of the employee's time." *Morrison v. Ocean State Jobbers, Inc.*, 290 F.R.D. 347, 362 n.10 (D. Conn. 2013).

When asked about any discrepancies between their deposition testimony and resumes, several of the collective members echoed this sentiment. *See, e.g.*, Pls.' App'x, Ex. 5, at 111:17–19 (David DePyper: "So obviously you want to put your best foo[t] forward when you submit stuff like this . . . for your resume, applications, whatever it may be."); *id.*, Ex. 8, at 39:15–22 (Kate Milashus: "Well, if I wrote what my actual time was spent doing in the Mariano's bakery, I don't think I would have gotten a call for

35

another manager's position. . . . Because my duties at the Mariano's bakery were not exactly managerial. They were cleaning, baking, taking care of customers."); *id.*, Ex. 11, at 59:4–10 (John Nicholaides: "Well, I was trying to get a management job. So I was definitely overstating parts in some of these processes . . . . I had no time for training. And the workload planning is, I mean, that's just garbage language that is intended to make it sound like I was doing a lot more than I was."); *id.*, Ex. 12, at 58:21–23 (Sheri Pletsch: "Because I just buffed up my resume so I could find myself a decent job where I can make real good money. . . . Everybody does it to help them get a good job. I just put it on there to see if I can open doors where I can make extra money . . . ."); *id.*, Ex. 15, at 62:1–6 (Autumn Wancket: "I mean, this is just my resume, this is, like, a job description for if I was trying to get another job. Is it what I do every day? It's - - it's not."). Certainly the defendants may argue that this has a bearing on these collective members' credibility. But the fact that many of the collective members both (a) have resumes that emphasize managerial experience and (b) explain those resume statements as puffery indicates a further similarity among the collective members—not a difference.

The same arguments apply to the performance reviews that the defendants highlight in their reply brief. Employees commonly emphasize and bolster more important aspects of their work when their performance is being reviewed by higher-ups. It is unsurprising that many collective members did so in these cases. And this sort of boasting does not indicate any unique credibility issues that would undermine collective treatment.

Lastly, the defendants suggest these cases are analogous to another case

involving alleged manager misclassification at Mariano's: *Haugen v. Roundy's Illinois, LLC*. But that case is distinguishable in critical respects. *Haugen* involved suits by Personnel Service Managers at Mariano's, who are alleged in this dispute to be higher up in the management hierarchy than department managers. *See Haugen*, 552 F. Supp. 3d at 807. The plaintiffs in these cases, in contrast, are department managers who allege that higher-ups—store directors and Personnel Service Managers—are responsible for most of the actual managerial work, leaving the plaintiffs with mostly non-exempt work responsibilities. The *Haugen* plaintiffs therefore did not face the same constraining circumstances the plaintiffs in these cases testify to.

That aside, it was not disputed in *Haugen* that the Personnel Service Managers engaged in significant managerial work. The *Haugen* plaintiffs conceded that they were "responsib[le] for human-resource functions," "including recruiting and hiring, handling employee complaints and grievances, safeguarding employee morale, and ensuring that employees have completed necessary certification and training." *Id.* Their argument was not that they did not have managerial responsibilities—which is what the plaintiffs argue in these cases—but that they were often given non-managerial tasks "in addition to their [managerial] duties." *Id.*

Finally, the court in *Haugen* denied collective certification based on "deposition evidence . . . reveal[ing] significant differences in the degree to which plaintiffs were required to perform non-[managerial] tasks," as some plaintiffs testified they spent over "50% of [their] workday" on non-managerial, "front end" tasks while others "did not testify to performing any 'front end' duties at all." *Id.* at 808–09. The opposite is true in the present cases. The collective members here have uniformly testified that they spent

a majority of their time on the "front lines," "work[ing] side by side with hourly workers doing their same tasks."  Pls.' App'x ¶¶ 32, 35.  The variation in testimony that led the court in *Haugen* to find that the plaintiffs were not similarly situated is not present here.

*     *     *

After reviewing the relevant factors, the Court concludes that the plaintiffs have shown by a preponderance of the evidence that they are similarly situated.  As discussed above, the evidence suggests the plaintiffs are similar in a number of material respects.  Each plaintiff—as a department manager—was classified as exempt without consideration of any individualized circumstances, constrained by an upper-level management hierarchy, expected to work alongside non-exempt hourly workers, and not paid overtime despite expectations that they work 50 hours a week.  The defendants' cited exemptions and purported credibility issues do not detract from these similarities.  If anything, the defendants' broad-stroke attempt to claim all department managers are exempt and paint every collective member as not credible highlights their similarities.  Nor do these arguments persuade the Court that the proposed collective actions would be unfair, inefficient, or unmanageable.  The Court therefore grants the plaintiffs' motion for FLSA collective certification of the two proposed collectives:  a twenty-eight-plaintiff collective of Meat Managers and Bakery Managers and a seventy-six-plaintiff collective of Deli Managers and Hot Foods Managers.

## Conclusion

For the reasons stated above, the Court denies the plaintiffs' motion for Rule 23 class certification but grants their motion for FLSA collective action certification [*DePyper* dkt. 172; *Pletsch* dkt. 134] on the following collectives:  (1) the twenty-eight-

plaintiff collective of Meat Managers and Bakery Managers and (2) the seventy-six-plaintiff collective of Deli Managers and Hot Foods Managers. The Court therefore denies the defendants' motion to decertify the FLSA collective actions [*DePyper* dkt. 169; *Pletsch* dkt. 131].

Date:  August 22, 2025

_____
MATTHEW F. KENNELLY
United States District Judge